**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com

*Attorneys for Irving H. Picard, Esq., Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>       Debtor. | Adv. Pro. No.  08-01789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>       Plaintiff,<br><br>       v.<br><br>PRIMEO FUND<br><br>       and<br><br>HSBC BANK PLC,<br><br>       and<br><br>HSBC SECURITIES SERVICES (LUXEMBOURG) S.A.,<br><br>       Defendants. | Adv. Pro. No. _____ (BRL) |

## COMPLAINT

Irving H. Picard, Esq. (the "Trustee"), as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"), by and through his undersigned counsel, for his Complaint, states as follows:

## NATURE OF PROCEEDING

1.      This adversary proceeding arises from the massive Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff"). In early December 2008, BLMIS generated client account statements for its nearly 7,000 client accounts at BLMIS. When added together, these statements purportedly show that clients of BLMIS had approximately $64.8 billion invested with BLMIS. In reality, BLMIS had assets on hand worth a small fraction of that amount. On March 12, 2009, Madoff admitted to the fraudulent scheme and pled guilty to 11 felony counts, and on June 29, 2009, he was sentenced to 150 years imprisonment as a result of his conviction for the fraud. Defendant Primeo Fund ("Primeo") has received avoidable transfers from BLMIS, and the purpose of this proceeding is to recover the avoidable transfers received by Primeo.

2.      This adversary proceeding is brought pursuant to 15 U.S.C. §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 502(d), 542, 547, 548(a), 550(a) and 551 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. §§ 270 *et seq.* (McKinney 2001)) and other applicable law, for turnover, accounting, preferences, fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of Primeo. The Trustee seeks to set aside such transfers and preserve the property for the benefit of BLMIS' defrauded customers.

## JURISDICTION AND VENUE

3.     This is an adversary proceeding brought in this Court, the Court in which the main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding") is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding"). This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and 15 U.S.C. §§ 78eee(b)(2)(A) and (b)(4). This Court has personal jurisdiction under N.Y. C.P.R.L. § 302(a)(1) and Bankruptcy Rule 7004.

4.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), (F), (H) and (O).

5.     Venue in this district is proper under 28 U.S.C. § 1409.

## BACKGROUND, THE TRUSTEE AND STANDING

6.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") filed a complaint in the District Court that commenced the District Court Proceeding against Madoff and BLMIS. The District Court Proceeding remains pending in the District Court. The SEC complaint alleged that the Madoff and BLMIS engaged in fraud through the investment advisor activities of BLMIS.

7.     On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order, which appointed Lee S. Richards, Esq., as receiver (the "Receiver") for the assets of BLMIS.

8.     On December 15, 2008, pursuant to 15 U.S.C. § 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC").  Thereafter, pursuant to 15 U.S.C. § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

9.     Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

(a)     appointed the Trustee for the liquidation of the business of BLMIS pursuant to 15 U.S.C.§ 78eee(b)(3);

(b)     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to 15 U.S.C. § 78eee(b)(3); and

(c)     removed the case to this Bankruptcy Court pursuant to 15 U.S.C. § 78eee(b)(4).

10.     By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

11.     At a plea hearing (the "Plea Hearing") on March 12, 2009 in the case captioned *United States v. Madoff,* Case No. 09-CR-213(DC), Madoff pled guilty to an 11-count criminal information filed against him by the United States Attorneys' Office for the Southern District of New York.  At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."  (Plea Hr'g Tr. at 23: 14-17).  Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal."

(*Id.* at 23: 20-21). At a hearing on June 29, 2009, Madoff was sentenced to 150 years imprisonment as a result of his conviction for fraud.

12.     As the Trustee appointed under SIPA, the Trustee has the job of recovering and paying out customer property to BLMIS' customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors. The Trustee is in the process of marshalling BLMIS' assets, and the liquidation of BLMIS' assets is well underway. However, such assets will not be sufficient to reimburse the customers of BLMIS for the billions of dollars that they invested with BLMIS over the years. Consequently, the Trustee must use his authority under SIPA and the Bankruptcy Code to pursue recovery from customers who received preferences and/or payouts of fictitious profits to the detriment of other defrauded customers whose money was consumed by the Ponzi scheme. Absent this or other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of 15 U.S.C. § 78fff-2(c)(1).

13.     Pursuant to 15 U.S.C. § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in addition to the powers granted by SIPA pursuant to 15 U.S.C. § 78fff(b). Chapters 1, 3, 5 and Subchapters I and II of Chapter 7 of the Bankruptcy Code are applicable to this case.

14.     Pursuant to 15 U.S.C. § 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meanings of sections 547 and 548 of the Bankruptcy Code and the date of the commencement of the case within the meaning of section 544 of the Bankruptcy Code.

15.     The Trustee has standing to bring these claims pursuant to 15 U.S.C. § 78fff-1

and the Bankruptcy Code, including 11 U.S.C. §§ 101 *et seq.* and sections 323(b) and 704(a)(1),

because, among other reasons:

    a.   BLMIS incurred losses as a result of the claims set forth herein;

    b.   The Trustee is a bailee of customer funds entrusted to BLMIS for investment

        purposes; and

    c.   The Trustee is the assignee of claims paid, and to be paid, to customers of BLMIS

        who have filed claims in the liquidation proceeding (such claim-filing customers,

        collectively, "Accountholders").  As of this date, the Trustee has received

        multiple express unconditional assignments of the applicable Accountholders'

        causes of action, which actions could have been asserted against Primeo.  As

        assignee, the Trustee stands in the shoes of  persons who have suffered injury, in

        fact, and a distinct and palpable loss for which the Trustee is entitled to

        reimbursement in the form of monetary damages.

## THE FRAUDULENT PONZI SCHEME

16.     BLMIS is a New York limited liability company that is wholly owned by Madoff.

Founded in 1959, BLMIS operated from its principal place of business at 885 Third Avenue,

New York, New York.  Madoff, as founder, chairman, and chief executive officer, ran BLMIS

with family members and a number of additional employees.  BLMIS was registered with the

SEC as a securities broker-dealer under section 15(b) of the Securities Exchange Act of 1934, 15

U.S.C. § 78*o*(b).  By that registration, BLMIS is a member of SIPC.  BLMIS had three business

units:  investment advisory (the "IA Business"), market making and proprietary trading.

17.     Outwardly, Madoff ascribed the IA Business' consistent investment success to his investment strategy called the "split-strike conversion" strategy, which involved the purchase of securities, options and government securities.

18.     Although clients of the IA Business received monthly or quarterly statements purportedly showing the securities, options and government securities that were held in—or had been traded through—their accounts, as well as the growth of and profit from those accounts over time, the trades reported in these statements were a complete fabrication.  The security purchases and trades depicted in the account statements never occurred and the profits reported were entirely fictitious.  At the Plea Hearing, Madoff admitted that he never in fact purchased any of the securities he claimed to have purchased for customer accounts.  Indeed, based on the Trustee's investigation to date and with the exception of isolated individual trades for certain clients other than Primeo, there is no record of Madoff and/or BLMIS having cleared any purchase or sale of securities at the Depository Trust & Clearing Corporation, the clearing house for such transactions, or at any other trading platform on which BLMIS could have reasonably traded securities.

19.     Madoff and/or BLMIS, over the years, falsely assured clients and regulators that BLMIS conducted all trades on the over-the-counter market, after hours.  To bolster that false representation, BLMIS periodically wired hundreds of millions of dollars to BLMIS' affiliate, Madoff Securities International Ltd. ("MSIL"), a London-based entity controlled by Madoff. MSIL did not use the wired funds to purchase securities for the accounts of the IA Business clients.

20.     Additionally, based on the Trustee's investigation to date, there is no evidence that BLMIS ever purchased or sold any of the options that Madoff claimed on customer statements to have purchased.

21.     For all periods relevant hereto, the IA Business was operated as a Ponzi scheme and Madoff concealed the ongoing fraud in an effort to hinder and delay other current and prospective customers of BLMIS from discovering the fraud.  The money received from investors was not set aside to buy securities as purported, but instead was primarily used to make the distributions to, or payments on behalf of, other investors.  The money sent to BLMIS for investment, in short, was simply used to keep the operation going and to enrich Madoff, his associates and others, including Primeo, until such time as the requests for redemptions in December 2008 overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

22.     During the scheme, certain investors requested and received distributions of the "profits" listed for their accounts which were nothing more than fictitious profits.  Other investors, from time to time, redeemed or closed their accounts, transferred portions to other accounts or removed portions of the purportedly available funds, and were paid consistently with the statements they had been receiving.  Some of those investors later re-invested part or all of those withdrawn payments with BLMIS.

23.     When payments were made to or on behalf of these investors, including Primeo, the falsified monthly statements of accounts reported that the accounts of such investors included substantial gains.  In reality, BLMIS had not invested the investors' principal as reflected in customer statements.  In an attempt to conceal the ongoing fraud and thereby hinder, delay, and defraud other current and prospective investors, BLMIS paid to or on behalf of certain investors,

such as Primeo, the inflated amounts reflected in the falsified customer statements, including non-existent principal and fictitious profits, not such investors' true depleted account balances.

24.     BLMIS used the funds deposited from new investments to continue operations and pay redemption proceeds to or on behalf of other investors and to make other transfers.  Due to the siphoning and diversion of newly-invested funds to pay requests for payments or redemptions from older investors, BLMIS did not have the funds to pay investors on account of their new investments.  BLMIS was able to stay afloat only by using the principal invested by some clients to pay other investors or their designees.

### THE DEFENDANTS AND THE TRANSFERS

25.     Defendant Primeo is a open-ended investment fund with limited liability organized under the laws of the Cayman Islands, with a principal place of business at Bank of Bermuda (Cayman) Limited, P.O. Box 513 GT, HSBC House, 68 West Bay Road, George Town, Grand Cayman, Cayman Islands.  On January 23, 2009, Primeo was placed in voluntary liquidation in the Cayman Islands.  The appointment of the liquidators was recognized by the Grand Court of the Cayman Islands on May 8, 2009.

26.     Defendant HSBC Bank plc ("HSBC") is a banking institution with an address at 8 Canada Square, London E14 5HQ.  Upon information and belief, HSBC served as the beneficiary bank for Primeo.

27.     Defendant HSBC Securities Services (Luxembourg) S.A. ("HSBC (Luxembourg)"), formerly known as Bank of Bermuda (Luxembourg) S.A., is a banking institution with an address at 40, Avenue Monterey, L-2163 Luxembourg.  HSBC (Luxembourg) served as the custodian of the assets of Primeo.

28.     On August 7, 2002, HSBC (Luxembourg), then known as the Bank of Bermuda (Luxembourg) S.A., entered in a Sub-Custody Agreement with BLMIS whereby BLMIS would

act as the sub-custodian for certain funds for which HSBC (Luxembourg), then the Bank of Bermuda (Luxembourg) S.A., was the custodian. On or about September 30, 2004, BLMIS received a notice that the Bank of Bermuda (Luxembourg) S.A. was changing its name to HSBC Securities Services (Luxembourg) S.A. effective October 1, 2004. BLMIS held these funds in New York, New York for the benefit of Primeo.

29.     Upon information and belief, at all times relevant hereto, Primeo was a client of the IA Business. According to BLMIS' records, Primeo maintained an account with BLMIS through its custodian, HSBC (Luxembourg), that was designated account 1FN092 (the "Primeo Account"). The Primeo Account was opened on or about March 1, 1996 when a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options (the "Account Agreements") were executed and delivered to BLMIS at BLMIS' headquarters at 885 Third Avenue, New York, New York.

30.     The Customer Agreement signed by BLMIS and Primeo states that all transactions are subject to the Securities Exchange Act of 1934, the Commodities Exchange Act, the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System and the Commodities Futures Trading Commission, and all laws of the United States. Primeo voluntarily made transactions with BLMIS subject to these laws.

31.     Between April 1, 2004 and the Filing Date, HSBC and HSBC (Luxembourg), for the benefit of Primeo, invested $370,483,000 with BLMIS through 86 separate wire transfers directly into BLMIS' account at JPMorgan Chase & Co. in New York, New York, Account #000000140081703 (the "BLMIS Bank Account").

32.     The Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York. The Primeo Account

was held in New York, New York, through BLMIS. HSBC and HSBC (Luxembourg) consistently wired funds to the BLMIS Bank Account in New York, New York for application to the Primeo Account and the conducting of trading activities. All Defendants have intentionally taken advantage of the benefits of conducting transactions in the State of New York and, therefore, have submitted themselves to the jurisdiction of this Court for the purposes of this proceeding.

33. On or about December 29, 2006, BLMIS wired $3,500,000 from the BLMIS Bank Account to HSBC. On or about February 1, 2007, BLMIS wired an $10,900,000 from the BLMIS Bank Account to HSBC. On or about April 3, 2007, BLMIS wired another $1,000,000 from the BLMIS Bank Account to HSBC. Additionally, between December 2006 and August 2008, BLMIS withdrew funds from the Primeo Account on 70 occasions to make tax payments to the appropriate tax authorities on behalf of Primeo totaling $709,154. These transfers, all of which were apparently done for the benefit of Primeo, totaled approximately $16.1 million and took place within two years of the Filing Date (collectively, the "Two-Year Transfers"). The Two-Year Transfers are avoidable and recoverable under sections 548(a), 550(a)(1) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

34. Between July 2004 and December 2006, BLMIS wired the following amounts on the following dates from the BLMIS Bank Account to HSBC:

- $6,500,000 on or about July 23, 2004
- $1,700,000 on or about August 2, 2004
- $2,000,000 on or about September 3, 2004
- $1,500,000 on or about October 4, 2004
- $4,000,000 on or about March 3, 2005
- $10,000,000 on or about June 1, 2005
- $17,250,000 on or about July 1, 2005

- $8,000,000 on or about September 30, 2005
- $38,600,000 on or about November 3, 2005
- $12,850,000 on or about December 5, 2005
- $5,000,000 on or about March 1, 2006
- $5,500,000 on or about July 3, 2006
- $2,000,000 on or about August 2, 2006
- $2,800,000 on or about September 21, 2006
- $5,250,000 on or about November 3, 2006
- $1,000,000 on or about December 5, 2006

Additionally, between December 2002 and December 2006, BLMIS withdrew funds from the Primeo Account on 448 occasions to make tax payments to the appropriate tax authorities on behalf of Primeo totaling $4,867,793. These transfers, combined with the Two-Year Transfers, all of which were apparently done for the benefit of Primeo, totaled approximately $144.9 million and were made during the six years prior to the Filing Date (collectively, the "Six-Year Transfers"). The Six-Year Transfers are avoidable and recoverable under sections 544, 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3), and applicable provisions of N.Y. Debt. & Cred. §§ 273–276.

35.     Upon information and belief, Primeo knew or should have known that Madoff's IA Business was predicated on fraud. Hedge funds and funds of funds like Primeo were sophisticated investors that accepted fees from their customers based on purported assets under management and/or stock performance in consideration for the diligence they were expected to exercise in selecting and monitoring investment managers like Madoff. Primeo failed to exercise reasonable due diligence of BLMIS and its auditors in connection with the Ponzi scheme. Among other things, Primeo was on notice of the following indicia of irregularity and fraud but failed to make sufficient inquiry:

a. Financial industry press reports, including a May 27, 2001 article in Barron's entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks investors to keep mum," and a May, 2001 article in MAR/Hedge, a widely-read industry newsletter, entitled "Madoff Tops Charts; Skeptics Ask How," raised serious questions about the legitimacy of BLMIS and Madoff and their ability to achieve the IA Business returns they purportedly had achieved using the split-strike conversion strategy Madoff claimed to employ.

b. Madoff avoided questions about his IA Business operations, was consistently vague in responding to any such questions, and operated with no transparency.

c. BLMIS did not provide its customers with electronic real-time online access to their accounts, which was and is customary in the industry for hedge fund and fund of funds investors. BLMIS also utilized outmoded technology, including paper trading confirmations, despite Madoff's history of being in the forefront of computer-based trading. The use of paper confirmations created after the fact was critical to Madoff's ability to perpetuate his Ponzi scheme.

d. BLMIS functioned as both investment manager and custodian of securities. This arrangement eliminated another frequently utilized check and balance in investment management by excluding an independent custodian of securities from the process, and thereby furthering the lack of transparency of BLMIS to other investors, regulators, and outside parties.

e. BLMIS produced returns that were too good to be true, reflecting a pattern of abnormal profitability, both in terms of consistency and amount, that was simply not

credible. The Primeo Account received annual rates of return on investments with BLMIS ranging, on average, from approximately 10% to 19% for the years 1997 through 2006. The Primeo Account incurred a negative return in a particular month in only four months of purported trading during the period from March 1996 through May 2007, equal to 3.0% of the 135 months during that period. In contrast, for the same period, the S&P 500 had a total of 48 months which generated negative returns, equal to 35.6% of the 135 months during that period. BLMIS' returns could not be reproduced by other skilled hedge fund managers, and those managers who attempted to employ the split-strike conversion strategy purportedly used by BLMIS consistently failed to even approximate its results.

f.      Primeo received higher purposed annual rates of return on its investments with BLMIS as compared to the interest rates BLMIS could have paid to commercial lenders during the relevant time period. Upon information and belief, Primeo never questioned why Madoff accepted its investment capital in lieu of other available alternatives that would have been more lucrative for BLMIS.

g.      At times, Primeo's monthly account statements reflected trades purportedly purchased or sold on behalf of the Primeo Account in certain securities that were allegedly executed at prices outside the daily range of prices for such securities traded in the market on the days in question. For example, Primeo's monthly account statement for October 2003 reported a purchase of 191,037 shares of Intel Corporation (INTC) with a settlement date of October 7, 2003. BLMIS records reflect a trade date for these transactions of October 2, 2003, at a price of $27.63. However, the daily price range for Intel Corporation shares on October 2, 2003 was a low of $28.41 to a high of

$28.95.  In an example of a purported sale, Primeo's monthly account statement for December 2006 reported a sale of 45,050 shares of Merck & Co., Inc. (MRK) with a settlement date of December 28, 2006.  BLMIS records reflect a trade date for these transactions of December 22, 2006, at a price of $44.61.  However, the daily price range for Merck stock on December 22, 2006 was a low of $42.78 to a high of $43.42.

      h.      BLMIS would have had to execute massive numbers of options trades to implement its purported split-strike conversion strategy.  In order to implement this strategy, BLMIS purportedly purchased options on the S&P 100 index ("OEX") – which are traded on the Chicago Board Options Exchange ("CBOE") – in combination with purchases of select underlying stocks that are components of that index.  At times, the traded option volume BLMIS reported to its customers was simply impossible if those options had been exchange-traded because BLMIS reported a traded option volume that exceeded the total market traded option volume for that contract on that day.  For example, on April 20, 2007, with a settlement date of April 25, 2007, BLMIS purportedly bought a total of 6,899 OEX put options (with May expiration and a strike price of 670) in two lots of 4,542 and 2,357, when the total volume traded on the CBOE for all such contracts that day was 2,032.  Similarly, on that same day, BLMIS purportedly sold a total 6,899 OEX call options (with May expiration and a strike price of 680) in two lots of 4,542 and 2,357, when the total volume traded on the CBOE for all such contracts that day was 4,027.  In examining another measure of BLMIS' daily trading activity relative to the market, BLMIS' daily traded volume also represents the amount of outstanding contracts (also known as open interest) held by BLMIS.  A comparison of BLMIS volume (share of total market open interest) with the total market open interest for same

contracts yields the same impossible conclusion. For example, again on April 20, 2007, the CBOE market's reported total outstanding contracts for OEX put options (with May expiration and a strike price of 670) was only 3,142, which is lower than BLMIS reported outstanding contracts or volume of 6,899. Therefore, it would have been impossible for both BLMIS' open interest and volume to exceed that of the market, respectively, for the identical contract on the same day. In each of these instances, Primeo knew or should have known that the option trading volumes reported by BLMIS were impossible if exchange-traded.

i.     BLMIS had purportedly told its investors that it purchased these options in the over-the-counter ("OTC") market. Trading options in the OTC market likely would have been more expensive than trading over the CBOE, yet those costs did not appear to be passed on to BLMIS' investors. The absence of such costs, together with BLMIS' representation that it was trading in the OTC market, should have prompted sophisticated hedge funds like Primeo to request verification of the trades and demand more transparency into the operations of BLMIS.

j.     Certain of the Primeo's monthly account statements reflected trades purchased or sold on behalf of the Primeo Account in certain securities that were allegedly settled on weekends and/or holidays. For example, Primeo's monthly account statement for the month of January 2000 reported alleged purchases of 434 S&P 100 Index put option contracts and equal numbers of S&P 100 Index call option contracts, which purportedly settled on January 8, 2000—a Saturday.

k.     BLMIS' statements to investors reflected a consistent ability to trade stocks near their monthly highs and lows to generate consistent and unusual profits. No

experienced investment professional could have reasonably believed that this could have been accomplished legitimately.

l.       BLMIS, which reputedly ran the world's largest hedge fund, was purportedly audited by Friehling & Horowitz, an accounting firm that had three employees, one of whom was semi-retired, with offices located in a strip mall. No experienced investment professional could have reasonably believed it possible for any such firm to have competently audited an entity the size of BLMIS.

m.       The compensation system utilized by BLMIS was atypical in that BLMIS, the entity purportedly employing the hugely-successful and secret proprietary trading system, was compensated only for the trades that it executed, while Primeo, whose only role was to funnel money to BLMIS, received administrative fees and a share of the profits that would normally go to the entity in the position of BLMIS. This compensation arrangement, together with the lack of transparency and other factors listed herein, should have caused an experienced investment professional to question Madoff's operation.

n.       Despite its immense size, BLMIS was substantially a family-run operation, employing many of Madoff's relatives, and virtually no outside professionals.

o.       Upon information and belief, at no time did Primeo match any trade confirmations provided by BLMIS with actual trades executed through any domestic or foreign public exchange despite the fact that Primeo had hundreds of millions of dollars in assets and easily could have afforded to do this.

p.       Based on all of the foregoing factors, many banks, industry advisors and insiders who made an effort to conduct reasonable due diligence flatly refused to deal

with BLMIS and Madoff because they had serious concerns that their IA Business operations were not legitimate.

q.     BLMIS purported to convert all of its holdings to cash immediately before each quarterly report, a strategy that had no practical benefit but which had the effect of shielding BLMIS' purported trading activities from scrutiny.

36.     This Complaint seeks the return of all of the above-listed transfers made to or for the benefit of Primeo, respectively, by BLMIS or the value of such transfers.

37.     All of the transfers were and continue to be customer property within the meaning of 15 U.S.C. § 78*lll*(4), and are subject to turnover pursuant to section 542 of the Bankruptcy Code.

38.     On information and belief, at least some of the funds transferred by BLMIS to or for the benefit of Primeo are being held in accounts at HSBC.  One such account is in the name of Primeo's custodian, HSBC (Luxembourg).  These funds being held by HSBC are the subject of a pending action in England by Primeo against HSBC for turnover.

39.     The Two-Year and Six-Year Transfers are avoidable and recoverable under sections 544, 548(a), 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3), and applicable provisions of N.Y. CPRL § 203(g) (McKinney 2001) and N.Y. Debt. & Cred. §§ 273–276 (McKinney 2001).

40.     To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

41.     The Trustee's investigation is on-going and the Trustee reserves the right to (i) supplement the information with respect to the Two-Year and Six-Year Transfers and any

additional or subsequent transfers, and (ii) seek recovery of such additional or subsequent transfers.

**COUNT ONE**
**TURNOVER AND ACCOUNTING – 11 U.S.C. § 542**

42.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

43.     The Two-Year and Six-Year Transfers constitute property of the estate to be recovered and administered by the Trustee pursuant to section 541 of the Bankruptcy Code and pursuant to 15 U.S.C. § 78fff-2(c)(3).

44.     As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code, the Trustee is entitled to the immediate payment and turnover of the Two-Year and Six-Year Transfers from Defendants to the Trustee.

45.     As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code, the Trustee also is entitled to an accounting of all such transfers received, directly or indirectly, by the defendants from BLMIS.

**COUNT TWO**
**FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(A), 550, AND 551**

46.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

47.     The Two-Year Transfers were made on or within two years before the filing date of the BLMIS case.

48.     The Two-Year Transfers were made by BLMIS with the actual intent to hinder, delay, and defraud some or all of BLMIS' then existing or future creditors.

49.     The Two-Year Transfers constitute fraudulent transfers avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and are recoverable from Primeo pursuant to section 550(a) of the Bankruptcy Code.

50.     As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Two-Year Transfers, (b) directing that the Two-Year Transfers be set aside, and (c) recovering the Two-Year Transfers, or the value thereof, from Primeo for the benefit of the estate of BLMIS.

## COUNT THREE
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B) , 550, AND 551

51.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

52.     The Two-Year Transfers were made on or within two years before the Filing Date.

53.     BLMIS received less than a reasonably equivalent value in exchange for each of the Two-Year Transfers.

54.     At the time of each of the Two-Year Transfers, BLMIS was insolvent, or became insolvent as a result of the Two-Year Transfers in question.

55.     At the time of each of the Two-Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

56.     At the time of each of the Two-Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS' ability to pay as such debts matured.

57. The Two-Year Transfers constitute fraudulent transfers avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and are recoverable from Primeo pursuant to section 550(a) of the Bankruptcy Code.

58. As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Two-Year Transfers, (b) directing that the Two-Year Transfers be set aside, and (c) recovering the Two-Year Transfers, or the value thereof, from Primeo for the benefit of the estate of BLMIS.

**COUNT FOUR**
**FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW**
**§§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551**

59. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

60. At all relevant times, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code, or that were and are not allowable only under section 502(e).

61. The Six-Year Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS. BLMIS made the Six-Year Transfers to or for the benefit of Primeo in furtherance of a fraudulent investment scheme.

62. As a result of the foregoing, pursuant to sections 276, 276-a, 278 and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six-Year Transfers, (b) directing that the Six-Year Transfers be set aside, (c) recovering the Six-Year Transfers, or the value thereof, from Primeo for the benefit of the estate of BLMIS, and (d) recovering attorney's fees from Primeo.

## COUNT FIVE
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
## §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), 551 AND 1107

63. The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

64. At all relevant times, there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code, or that were and are not allowable only under section 502(e).

65. BLMIS did not receive fair consideration for the Six-Year Transfers.

66. At the time of each of the Six-Year Transfers, BLMIS was insolvent, or became insolvent as a result of the Six-Year Transfers in question.

67. As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 273, 278 and 279 of the New York Debtor and Creditor Law and sections 544(b), 550, 551 of the Bankruptcy Code: (a) avoiding and preserving the Six-Year Transfers, (b) directing that the Six-Year Transfers be set aside, and (c) recovering the Six-Year Transfers, or the value thereof, from Primeo for the benefit of the estate of BLMIS.

## COUNT SIX
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
## §§274, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), 551, AND 1107

68. The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

69. At all relevant times, there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code, or that were and are not allowable only under section 502(e).

70.     BLMIS did not receive fair consideration for the Six-Year Transfers.

71.     At the time BLMIS made each of the Six-Year Transfers, BLMIS was engaged or was about to engage in a business or a transaction for which the property remaining in its hands after each of the Six-Year Transfers was an unreasonably small capital.

72.     As a result of the foregoing, pursuant to sections 274, 278 and/or 279 of the New York Debtor and Creditor Law and sections 544(b) and 550(a) of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six-Year Transfers, (b) directing that the Six-Year Transfers be set aside, and (c) recovering the Six-Year Transfers, or the value thereof, from Primeo for the benefit of the estate of BLMIS.

**COUNT SEVEN**
**FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW**
**§§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A),  AND 551**

73.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

74.     At all relevant times, there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

75.     BLMIS did not receive fair consideration for the Six-Year Transfers.

76.     At the time BLMIS made each of the Six-Year Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

77.     As a result of the foregoing, pursuant to sections 275, 278 and/or 279 of the New York Debtor and Creditor Law and sections 544(b), 550(a), and 551 of the Bankruptcy Code, the

Trustee is entitled to a judgment: (a) avoiding and preserving the Six-Year Transfers, (b) directing that the Six-Year Transfers be set aside, and (c) recovering the Six-Year Transfers, or the value thereof, from Primeo for the benefit of the estate of BLMIS.

## COUNT EIGHT
## UNDISCOVERED FRAUDULENT TRANSFERS – NEW YORK CIVIL PROCEDURE LAW AND RULES 203(g) AND NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

78.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

79.     At all times relevant to the Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

80.     At all times relevant to the Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code, or that were and are not allowable only under section 502(e).

81.     The Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Transfers to or for the benefit of Primeo in furtherance of a fraudulent investment scheme.

82.     As a result of the foregoing, pursuant to NY CPLR 203(g) sections 276, 276-a, 278 and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside; (c) recovering the Transfers, or the value thereof, from Primeo for the benefit of the estate of BLMIS, and (d) recovering attorney's fees from Primeo.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against Defendants as follows:

i.      On the First Claim for Relief, pursuant to sections 542, 550(a), and 551 of the Bankruptcy Code: (a) that the property that was the subject of the Preference Period, Two-Year and Six-Year Transfers be immediately delivered and turned over to the Trustee by Defendants, and (b) for an accounting by the defendants of the property that was the subject of the Two-Year and Six-Year Transfers, or the value of such property, and all other transfers of property by BLMIS to Primeo, whether direct or indirect;

ii.      On the Second Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Two-Year Transfers, (b) directing that the Two-Year Transfers be set aside, and (c) recovering the Two-Year Transfers, or the value thereof, from Primeo for the benefit of the estate of BLMIS;

iii.      On the Third Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Two-Year Transfers, (b) directing that the Two-Year Transfers be set aside, and (c) recovering the Two-Year Transfers, or the value thereof, from Primeo for the benefit of the estate of BLMIS;

iv.      On the Fourth Claim for Relief, pursuant to sections 276, 276-a, 278 and/or 279 of the New York Debtor & Creditor Law and sections 544(b), 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Six-Year Transfers, (b) directing that the Six-Year Transfers be set aside, and (c) recovering the Six-Year Transfers, or the value thereof, from Primeo for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from Primeo;

v.      On the Fifth Claim for Relief, pursuant to sections 273, 278 and/or 279 of the New York Debtor and Creditor Law and sections 544(b), 550, and  551 of the Bankruptcy Code:

(a) avoiding and preserving the Six-Year Transfers, (b) directing that the Six-Year Transfers be set aside, and (c) recovering the Six-Year Transfers, or the value thereof, from Primeo for the benefit of the estate of BLMIS;

vi.     On the Sixth Claim for Relief, pursuant to sections 274, 278 and/or 279 of the New York Debtor and Creditor Law and sections 544(b), 550, 551, and 1107 of the Bankruptcy Code: (a) avoiding and preserving the Six-Year Transfers, (b) directing the Six-Year Transfers be set aside, and (c) recovering the Six-Year Transfers, or the value thereof, from Primeo for the benefit of the state of BLMIS;

vii.    On the Seventh Claim for Relief, pursuant to New York Debtor and Creditor Law sections 275, 278 and/or 279 and Bankruptcy Code sections 544(b), 550, 551, and 1107: (a) avoiding and preserving the Six-Year Transfers, (b) directing that the Six-Year Transfers be set aside, and (c) recovering the Six-Year Transfers, or the value thereof, from Primeo for the benefit of the estate of BLMIS;

viii.   On the Eighth Claim for Relief, pursuant to NY CPLR 203(g) and sections 276, 276-a, 278 and/or 279 of the New York Debtor & Creditor Law and section 544(b), 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Two-Year and Six-Year Transfers, (b) directing that the Two-Year and Six-Year Transfers be set aside, and (c) recovering the Two-Year and Six-Year Transfers, or the value thereof, from Primeo for the benefit of the estate of BLMIS, and (d) recovering attorney's fees from Primeo.

ix.     On all Claims for Relief, pursuant to federal common law and sections 5001 and 5004 of the N.Y. C.P.L.R., awarding the Trustee prejudgment interest from the date on which the Two-Year and Six-Year Transfers were received;

x.      On all Claims for Relief, establishment of a constructive trust over the proceeds of the transfers in favor of the Trustee for the benefit of the estate of BLMIS;

xi.      On all Claims for Relief, assignment of Primeo's rights to seek refunds from the government for federal, state, and local taxes paid on fictitious profits during the course of the scheme;

xii.      Reserving the Trustee's ability to supplement the information on the Two-Year and Six-Year Transfers and any additional transfers and seek recovery of such additional transfers;

xiii.      Awarding the Trustee all applicable interest, costs, and disbursements of this action; and

xiv.      Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

Dated:   New York, New York
            July 15, 2009

                                                    /s/ Marc E. Hirschfield
                                                    Baker & Hostetler LLP
                                                    45 Rockefeller Plaza
                                                    New York, New York 10111
                                                    Telephone: (212) 589-4200
                                                    Facsimile: (212) 589-4201
                                                    David J. Sheehan
                                                    Email: dsheehan@bakerlaw.com
                                                    Marc E. Hirschfield
                                                    Email: mhirschfield@bakerlaw.com

                                                    *Attorneys for Irving H. Picard, Esq., Trustee*
                                                    *for the Substantively Consolidated Liquidation*
                                                    *of Bernard L. Madoff Investment Securities*
                                                    *LLC and Bernard L. Madoff*

Of Counsel:

Frederick W. Chockley III
Jennifer M. Walrath
Baker & Hostetler LLP
1050 Connecticut Avenue, N.W.
Suite 1100
Washington, DC  20036
Telephone: (202) 861-1500
Facsimile: (202) 861-1783
fchockley@bakerlaw.com